Mr. Rodman, II May it please the Court, my name is Jason Rodman and I represent the appellant, George Plessinger. I would like to reserve three minutes for rebuttal. Of note, a non-attorney rep represented this claimant at the hearing. Mr. Plessinger has radiating symptoms down his leg all the way to his foot. He has motor loss that means he can't do the ordinary sensory or reflex things that ordinary folks do. He has had positive both sitting and supine which means laying down, straight leg, raised test. And he has had back problems with pain and numbness in his legs and feet. And he has had at least Dr. Coleman discuss these specific impairments in a way that seems to line up remarkably with the listing and is otherwise a functional comment. And there are two main arguments today and they weave together. The first is that Plessinger's condition was such that the surgery did not make sense and the doctors that should have been given proper consideration and lead consideration were not consulted. Instead, the credibility and this is where they weave together. The credibility analysis seems to be outsourced to a Dr. Pella, a medical examiner who testified at hearing. And so to flesh out the first portion of that a little bit first, and this is where it gets into the fact that Plessinger per Dr. Coleman at 484 and 487 to 8 and this is also noted in the district court brief at page 18 for an argument raised by opposing counsel. But per Dr. Coleman, he made the clinical assessment that the impairments were so bad that Plessinger could not walk more than 50 yards without his legs tingling. And Dr. Coleman further stated that he believes his spinal stenosis and L2 to 3 and L3 to 4, which are almost at the very bottom of the back but not quite, are symptomatic and function limited. Can I ask you a question? Go ahead. When a doctor says these are symptomatic, is that as opposed to malingering? Is that the way to interpret that? I think that's right, which is where it goes to credibility. Not exaggerated. This guy has serious problems. I think that's right. And he's had problems since birth, but they seem to have gotten worse. And not only that, but that language about them being symptomatic and specifically tying them back to the L2, L3, L4 vertebra goes to some of the language corresponding to the listing, talking about radiculopathy and I think neuroatomic distribution is the language incidentally in the listing. But the point is, even if you don't look at the listing part of it, it's functional language and it gets to the heart because listings are just a way to approximate the functionality. Let me try to put my question to you this way. It sure looks to me like the agency's Mr. Plessinger was disabled, yet he was denied before getting to the hearing stage. I think that's right. I think that's absolutely right. And I don't know where to go with that except to weave in the way they seem to have pulled off that feat with Mr. Plessinger's actual functionality was by bringing in a medical examiner who had spent his career as a pulmonologist, which is a lung doctor, so like looking at breathing machines and things like that. I know you attack Dr. Pella as being a pulmonologist. There are other issues with that opinion, but he is a medical doctor. He's able to testify. And an ALJ, at least in theory, can credit that testimony. Can I ask you just a couple of quick questions? As I understand this record, back in 2013, Mr. Plessinger was saying he was still able to drive a truck. Is that right? I don't have that on the top of my head, but I believe that's correct. Page five of your brief is where I think you got it. Yes, I believe that's correct. And he's the sort who would go out and do crazy, probably unwise things, and I think the record bears that out, which, you know, that is... Like the four-wheeler accident? Yes, yes. But that's where, and it's not so much that I'm critical of Dr. Pella as doing the wrong thing, per se, although I think that the briefing raises doubts about that. But the problem I have is procedural. It goes to the Armstrong case that I cited about the fundamental requirement of due process being the opportunity to be heard at a meaningful time and in a meaningful manner. And so where the ALJ has the medical examiner, in this case Dr. Pella, testify right before a testimony and then simply applies that almost verbatim, it sort of takes out the credibility step, which I think is problematic. And this is an activities of daily living argument, but with sort of a twist, but it makes remarkable sense on the facts at hand. I think activities of daily living, and I think that the Bjornson case, but in this case there's a Schumann case that seems directly in point, and that's actually in the Northern District of Illinois, but it applies principles inherent in different Seventh Circuit opinions, which is basically to say, in this case, Mr. Plesenger argues today that the fact that, you know, he wakes up, gets his children up, then lies down for a half hour, then gets his children on the bus, then lies down until afternoon and fixes lunch for his children, with his wife preparing dinner, and then he maybe can wash a few dishes at a time. That seems to be cited by the ALJ as if that is an activity of daily, those are activities of daily living that suggest he's functional enough to do some pretty detail-oriented work involving quite a level of concentration with his impairments that require him to lay down. And I don't think that that, and we don't think that that's consistent. Counsel, I'd like to go to the listing question. A plaintiff appellant here has not identified any medical opinion establishing that he satisfied all the criteria of 1.04a, correct? I think that is correct in that it has to do with the articulation required and the opinion almost verbatim lines up with the sort of thing that would read almost off the page of a 1.04 listing. So the question is why wasn't that analyzed in greater detail beyond simply asking someone who happens to be a lung doctor if the listings were considered and then also addressing it in detail in the opinion. But if I understand what you're saying correctly, it's not that, you're not asking us to decide why 1.04a was met. You're saying the ALJ failed to engage sufficiently with the most probably applicable listing. Is that right? Yes. And if there's nothing else at this time, I'll reserve the time for a rebuttal. That's fine. Mr. Montenegro. Good morning, Your Honor. My name is Leo Montenegro, apparent for the defendant appellee, the Acting Commissioner of Social Security. Your Honors, the medical history of this case is very straightforward. There's no dispute that Mr. Plessinger injured his back sometime at least in 2011 as documented in the record before us and had an MRI scan of his lumbar spine in June 2012 which showed problems resulting in treatment. The MRI scans at pages 287-288 of the record and he was treated conservatively with nerve root box, injections, medications. That's at pages 261 and 329. And in September of 2012, he was described as doing okay at page 329. Now, he allegedly became disabled in December of 2012 and things happened fairly quickly after that. He suffered a fall in December of 2012, correct? Yes, Your Honor. There are multiple complaints of back pain which he ascribed to lifting and turning and bending on page 277. This is all in January. And he fell out of a truck a few weeks prior in January and that's on page 328. The following month in February, he first saw Dr. Cashman, his neurosurgeon, and the month after that in March, he had back surgery. And the month after that in April, he reported that his back pain had increased. He had pain higher up in his back. And as a result of that, Dr. Cashman, improved leg pain was documented at the page and back pain was documented at pages 400 and 401. As a result of these new complaints, Dr. Cashman ordered MRI scans at the upper spine. Those didn't go anywhere. It didn't inform him of anything because Dr. Cashman later referred Mr. Plessinger to vocational rehabilitation, not vocational rehabilitation, I'm sorry, to local pain management for physical therapy and traction, for example. That's at page 387. Now, after that... Can we talk, counsel, about the ALJ's opinion? Sure, Your Honor. This is pretty... I've been doing this a long time and I've never seen one quite like this where we've got serious issues of pain and Dr. Pella, if I read his testimony correctly, says in essence, I don't see limitations that are disabling here, but further impairment would be related to credibility of pain on his function, Your Honor. It's a little awkward, but I understood him to be saying, in essence, to get to... to total disability, it's going to have to be based on the credibility of his pain complaints. And then I look at the ALJ's opinion and I don't see any engagement with things like evidence of daily activities. I see detailed reviews of medical records, but nothing that really counts to me as engagement. The plaintiff can't even stand up to take a shower, and the ALJ is saying he can stand and or walk for several hours at a time. The agency's own doctors are saying he can't walk more than a few feet at a time. So this is... I'll tell you, I've never seen a stronger case where benefits were denied. Well, Your Honor, I think this gets to the... I was saying medical history is the easy part. That's the hard part. They're conflicting medical opinions in this case. No doubt about that. But conflicting medical opinions involving... Look at where his treating doctors are. Look at where the state's own examining physicians are. They think he's disabled. At least that's what their RFC findings look like. And then Dr. Pella, who's never seen him, says this guy who apparently can't stand up to take a shower can do a job where he has to stand for several hours a day. Your Honor, the different medical opinions are... Some of them are ambiguous. The consultative examiners to whom I think you're referring, Dr. Laurenti, for example, opined as to various limitations, but it was understood that... Walking, how many feet? 20 to 30 feet. Standing, how many minutes? Five minutes. Climbing, how many stairs or flights of stairs? Five stairs. That's Laurenti, right? Yes, Your Honor. Dr. Laurenti also gave a more detailed opinion at pages 450 to 458, where he was actually asked as to specific work-related functional limitations. So let's look at that. Laurenti at 451, his total for a day, it's more generous, or I don't see how this adds up to an eight-hour day. I see three hours sit, 30 minutes stand, one hour walk, right? 451? Yes, Your Honor. Three hours of sitting, one hour of walking throughout the day. That's the agency's doctor who examined it. Yes, Your Honor. And there was also the state agency sources who gave different opinions as well. Drs. Corcoran, who opined as to light work, essentially, and Dr. Sands, who was closer to... Did Corcoran and Sands examine it? No, Your Honor. They based their opinions on portions of the record that were available, some of the evidence was available at the time. At that time, early on, right? Yes, Your Honor. Okay. Is there any evidence in this record of malingering or exaggeration of pain? No, Your Honor, but I don't think that's the only credibility factor at issue. No, it's not. So where does the ALJ engage on daily activities? I think, well, in his decision, he talks about some daily activities, but I don't think he spent a lot of time on that. I think more of his analysis was based on Dr. Pella's opinion, the post-surgery improvement, the conservative treatment, and, of course, the objective medical evidence. I'm sorry, Your Honor. Well, in speaking of the objective medical evidence, I've got to say, I was really troubled by the ALJ's engagement with Dr. Foucan's opinion. That was the neurologist to whom the surgeon referred him. I'm sorry, the neurosurgeon. Where the ALJ seemed to make a big deal out of the fact, well, he's not a candidate for surgery, it can't be that bad, is the conclusion. When, in fact, Foucan's analysis is, he's already had a failed back surgery and we really don't want to try that again unless all else has failed. That's not, it seemed to me, fair engagement with Dr. Foucan's opinion as to what kind of shape Mr. Plessinger is in. Well, Dr. Foucan's opinion was more than just that. Dr. Foucan actually pointed out, I can just quote, the significant herniations appear to be in the lumbar spine, but they appear to be predominantly right side. He does not have a lot of right leg pain. So Dr. Foucan is pointing out some of his doubts. Right. And this is the mystery of backs, right? Yes, Your Honor. You get bulging discs in places where you might expect pain and it's not there, and the pain in other places where the discs are bulging, right? That happens. But he does seem, he seems to have a lot of axial low back pain. I'm not sure lumbar discectomy at L3-4 and L4-5 is the right strategy. Other treatment options should be ignored, explored, encouraged to lose weight. If nothing works, please refer him back and I will consider lumbar discectomy. I mean, that's the opinion as to somebody who's in really tough shape. Yes, there's no question that Mr. Plessinger has serious back problems. The ALJ's finding reflects that. So let me go back. Where does the ALJ really engage with the issue of credibility, which Dr. Pella seems to have left out? The ALJ didn't have one specific place in his decision where he talked about credibility and isolation. How about daily activities? I'm not sure that he actually spoke at length. I don't think he did. About daily activities. This is a problem. Because even Dr. Pella, on whose opinion the ALJ's decision largely rests, said it would depend, his restrictions would depend on the credibility of his testimony about what he can and can't do. Yes, Your Honor. I think Dr. Pella's statement there really reflects his understanding that the differences between his opinion and other medical opinions and perhaps the difference between his opinion and what the ALJ ultimately finds could be affected by that variable of credibility. Right. So the ALJ's failure to engage in a detailed credibility analysis on the claimant's own testimony about what he can and can't do seems to be a gap, a notable gap in the opinion. I would disagree, Your Honor, just simply because daily activities, for example, aren't the only factor to be included. The ALJ said in his decision at page 29 that he would be discussing these factors throughout the decision, which I think is a fair thing to do given that under cases like Bjornsson, it's a bit difficult to, also analytically, a bit difficult to isolate a credibility analysis from the discussion of the other evidence. And what the ALJ is really looking for is some kind of consistency. So where does he engage? Throughout the decision while he's talking about... What's the best evidence he engaged on daily activities? I don't think that there was any... I don't recall there being any discussion of daily activities. I don't see it. Thanks. I think it's no secret here, Your Honor, that the case is really about the reliance on Dr. Pella. And Pella's saying, I don't have an opinion. He can't have an opinion about the credibility, right? Yes, he can. Because he's never examined him. Oh, but his value as a medical expert is because he saw the entire record and he was available... Yes, he saw the entire record and he did not see the patient and he left issues of credibility for others. So you can't rely totally on Pella. I just read that differently, Your Honor, that he was acknowledging that that's a variable that might... So Pella, you think Pella reached a credibility determination? I think he made not a credibility determination in the sense that social security requires one, but I think as part of his opinion, he took into account all of the medical evidence, which included claimant's pain, frankly, Mr. Plessinger's pain. And I would submit, I see that I'm over time, but I would submit that Dr. Pella's opinion, because it was well-informed, because he was available for questioning, and because he did address all the specific issues as required for determining an RFC, at least from a doctor, that it constitutes substantial evidence upon which the ALJ properly relied. If there are no further questions, Your Honor, thank you for your time. Thank you. Mr. Rodman, rebuttal. At this point, I think I would say that Mr. Plessinger is disabled, and point further to 7th Circuit case law cited within the Shoemake case, which I think is on point, unless you have any questions for me at this time. No, Your Honor. All right, thank you. Our thanks to both counsel. The case is taken under advisement.